## STOVALL'S EX'R v. SLAUGHTER et ux.

Court of Appeals of Kentucky.

May 28, 1954.

D. Carl Ross, Calhoun, D. M. Cooper, Elizabethtown, for appellant.

J. H. Thomas, Calhoun, for appellees.

STANLEY, Commissioner.

The defendants pleaded payment in the suit in equity of the executor of Mrs. Flora

944

B. Stovall against H. D. Slaughter and his wife, Mildred Slaughter, to recover on a note for $9,000 and to have a lien adjudged on certain real estate. The issue was submitted to a jury, which found for the defendants. The court rendered judgment accordingly. The plaintiff, as appellant, seeks a reversal upon the grounds (1) error in admitting certain testimony, and (2) the evidence does not support the verdict and judgment.

In April, 1947, Mrs. Stovall, a widow, sold her farm in Hardin County to H. D. Slaughter for $9,000 but reserved the use of the house and garden. Not long afterward, while Mr. Slaughter and his partners were harvesting the timber and he was boarding with Mrs. Stovall, he married her daughter, Mildred, who had been living with her mother on the place for several years. In September, 1947, Slaughter sold three-fourths interest in the farm to his partners in the timber business, and Mrs. Stovall joined in the deed. On or about the same time, September 23, 1947, Mr. and Mrs. Slaughter executed their demand note to Mrs. Stovall for $9,000 for money borrowed. The note provided for 3½% interest and recited that it was secured by a mortgage on certain McLean County land. Simultaneously, the three parties executed a writing which recited that the Slaughters would "at the earliest practicable date" give Mrs. Stovall a first mortgage on his place in McLean County to secure the note and that Mrs. Stovall should make her home with them and they would furnish her with clothing and board as a member of the family without any charge therefor, and she would not charge any interest on the note so long as they did so. No such mortgage was ever executed. In October, 1947, they moved to the McLean County farm. Mrs. Stovall died in November, 1949, survived by Mrs. Slaughter and another daughter and three sons.

Copies of the note and contract were filed with the petition. It stated that the defendants had had possession of the papers of the decedent, and had obtained and retained possession of the original note and contract, which they were called upon to produce. They testified they did not know what became of the note and the loss or disappearance is not explained by anyone.

The defendants pleaded payment of $7,000 in September or October, 1947, and $2,000 in November, 1948. The burden of proof was, of course, placed upon the defendants.

Over objection, Mr. Slaughter testified that he did not owe any note or money at the death of Mrs. Stovall except to his bank. During the course of his testimony, Mr. Slaughter slipped in three statements, direct or indirect, that he had paid Mrs. Stovall $7,000. Though the court sustained objections thereto, the jury had heard them. In association with two of such statements, however, he was permitted to testify that just before moving to McLean County (which would have been within a month of the execution of the note) he and Mrs. Stovall were in the front room of the house in Hardin County one day and Bill Bowman came in when there was $7,000 in money on the table between himself and Mrs. Stovall

Bowman, a 77 year old employee of Slaughter's timber company, also boarded with Mrs. Stovall. He testified that one Saturday he went into a room where Slaughter and Mrs. Stovall were sitting at a table and he saw some papers near him and "a great big pile of money" near her. This was at the Hardin County place. Mrs. Slaughter's daughter, Mrs. Calvert, testified that she had gone in her grandmother's bedroom and "he handed her some money." She had paid no attention to the quantity. But this was at the McLean County farm and not in Hardin County.

There was no other evidence of this inferrable payment. However, there were some general statements of the deceased woman to support the plea of payment of the note excepting $950 in September, 1949. There are several cogent circumstances tending to prove non-payment.

We confine the opinion to the question of admissibility of Slaughter's testimony that he sat at a table with the deceased with $7,000 in currency there.

First, we may note the suit was filed in equity to enforce a lien and that the issue of payment submitted to the jury was a legal issue upon which the equitable right depended, and that the form of the instructions was in accord. Sections 11 (3) and 12, Civil Code of Practice; Landrum & Adams v. Wells, Ky., 122 S.W. 213; Fornash v. Antrobus, 178 Ky. 621, 199 S.W. 781; Home Ins. Co. of New York v. Evans, 201 Ky. 487, 257 S.W. 22. Usually the verdict on such an issue is binding like that in an action at law. Morawick v. Martineck's Guardian, 128 Ky. 155, 107 S.W. 759, 32 Ky.Law Rep. 971; Elkhorn Land & Improvement Co. v. Wallace, 232 Ky. 741, 24 S.W.2d 560. But this decision does not call for a definite determination whether the verdict was binding or merely advisory for the case was tried and treated as a common-law action. So, we regard the testimony, which we hold was inadmissible, of such prejudicial effect that if it had been omitted, the verdict may have been different. Compare Truitt v. Truitt's Adm'r, 290 Ky. 632, 162 S.W.2d 31, 140 A.L.R. 1127.

Section 606, subsection 2 of Code (now KRS 421.210) denied the right of any person to testify for himself "concerning * * * any transaction with, or any act done or omitted to be done by" one who is "dead when the testimony is offered to be given" with certain inapplicable exceptions. The question is whether the evidence related to a "transaction" with the deceased woman whom the witness claimed he had paid.

Everyone recognizes the difficulty of defining the term "transaction" concretely. But certainly it contemplates some relation or action between the parties. It has been said by this Court, "A personal transaction or communication between a witness and the decedent embraces every variety of affairs which can form the subject of negotiations, interviews, or actions between two persons, and includes every method by which one person can derive impressions or information from the conduct, condition, or language of another." Barnett's Adm'r v. Brand, 165 Ky. 616, 177 S.W. 461, 463; Kentucky Utilities Co. v. McCarty's Adm'r, 169 Ky. 38, 183 S.W. 237.

Appended to the text of 58 Am.Jur., Witnesses, Sec. 238, is this note quoted from Sheldon v. Thornburg, 153 Iowa 622, 133 N.W. 1076; 155 A.L.R. 966:

"Anything said or done between the witness and deceased or any act or communication in which they both had any part, and of which both had knowledge and concerning which the deceased, if living, could speak in corroboration or denial of the statements of the living witness, is a 'transaction' within the purpose and intent of the law, and the surviving witness, if disqualified by interest, is incompetent to testify concerning it against the administrator of such deceased person."

Merely sitting with the deceased at a table on which there was some money can by itself hardly be deemed a personal transaction between them. But the situation was part of the circumstances introduced to prove payment of the money at that time and place. Slaughter's testimony was an indirect way of showing that he then and there paid that money to the deceased in satisfaction of his note. It was a prominent part of the picture. It might have been denied if Mrs. Stovall were alive to testify. No other witness undertook to say how much money was there.

"The statute prohibits not only direct testimony of a survivor that a personal transaction did or did not take place, and what did or did not occur between the parties, but also every attempt by indirection to prove the same thing, as by negativing the doing of a particular thing by any other person than the deceased, or by disconnecting a particular fact from its surroundings and permitting the

survivor to testify to what on its face may seem to be an independent fact when in truth it had its origin in or directly resulted from a personal transaction." 58 Am.Jur., Witnesses, Sec. 273.

A similar statement of the pertinent law is given in 4 Jones on Evidence, pp. 784 and 791. This construction of the term is recognized and applied in Fish v. Welch's Adm'r, 157 Ky. 19, 162 S.W. 553, 555, where the court held that a plaintiff in an action against an administrator to recover $1,000 in gold which she claimed to have loaned the deceased was disqualified from testifying that at the time she had $1,713 in gold on special bank deposit, withdrew it and later deposited all but $1,000 in another bank. The plaintiff's daughter testified to these acts of her mother and, in addition, that she had seen her deliver $1,000 in gold to the deceased. The court, referring to the proffered evidence of the plaintiff, said: "To permit her to testify to this would be to permit her, in effect, to say that she had $1,713 in gold on the night that Welch was at her house, of which her daughter speaks, and thereby inferentially allow her to testify against Welch, who is dead, that she had loaned him the $1,000. Manifestly this evidence was improper."

The term "transaction" as thus defined and as embracing acts which would inferentially prove it was likewise applied in Isert's Adm'r v. Carroll, 220 Ky. 54, 294 S.W. 783. That was an action on notes which the payor claimed he had paid by delivering back to the payee certain livestock which the instruments indicated the note had been given for. We held the defendant was disqualified from testifying to the identity of the stock or to explain the indefinite and ambiguous contract because it would involve a transaction with the deceased. See also Combs v. Roark's Adm'r, 221 Ky. 679, 299 S.W. 576.

 If the defendant in this case had not improperly and repeatedly stated to the jury that he had paid $7,000 on the note on that occasion, or if there were any substantial proof of payment, we might well regard the admission of the testimony discussed as not prejudicial. The evidence of payment—even including this—was meager indeed. We conclude the admission of Slaughter's testimony is a reversible error.

 No objection is raised on the appeal to the instructions offered by the defendant and given by the court. But we may observe they required or permitted the jury to find a verdict either that all the $9,000 had been paid or not paid. The plea and evidence as to the payment of $2,000 related to a time and occasion different from when and where the claimed $7,000 payment was made, and there is really no proof of any sort of the payment of more than $950 at that time. Upon another trial if the evidence be sufficient to go to the jury (a question we do not decide on the present record), we think the instructions should permit a separate finding as to the two payments claimed.

The judgment is reversed.